

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION (TOLEDO)

———————————————————x
:
TRAUTE WEIDMAN, derivatively on behalf of :
DANA CORPORATION. :
:
             Plaintiff(s), :
:
  vs. :
:
MICHAEL J. BURNS, ROBERT C. RICHTER. :
BENJAMIN F. BAILAR. GLEN H. HINER. :
RICHARD M. GABRYS. JAMES P. KELLY, :
RICHARD B. PRIORY. SAMIR G. GIBARA. :
DAVID E. BERGES. CHERYL W. GRISE, A. :
CHARLES BAILLIE, MARILYN R. MARKS, :
and EDMUND M. CARPENTER. :
:
:
        and Nominal Defendant :
:
DANA CORPORATION :
          Defendant(s). :
———————————————————x

**3:05CV7464**

**JUDGE CARR**

**VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT**

Plaintiff Traute Weidman is a shareholder of Dana Corporation ("Dana" or the "Company"), and files this Verified Shareholder Derivative Complaint (the "Complaint") on behalf of the Company against certain of its officers and directors seeking to remedy Defendants' violations of the law, including breaches of fiduciary duties relating to events that occurred

between April 21, 2004 and November 15, 2005, inclusive (the "Relevant Period") and that have caused substantial financial losses to Dana and other damages, including, but not limited to, its reputation and goodwill. Plaintiff hereby alleges upon personal knowledge as to her own acts and upon information and belief as to all other matters, based upon, *inter alia*, an investigation conducted by her counsel, which included, among other things, the review of publicly available documents filed with the United States Securities and Exchange Commission ("SEC"), press releases and other media reports.

## INTRODUCTION

1.      This is a derivative action brought by a shareholder of Dana, on behalf of the Company and against certain of its officers and directors, seeking to remedy Defendants' violations of state law, including breaches of fiduciary duties and unjust enrichment that have caused substantial financial losses to Dana as well as damage to its reputation and goodwill.

2.      Dana's Board of Directors, along with the Company's executive leadership, is responsible for ensuring that the Company has sufficient internal controls to detect and remedy material weaknesses in Dana's financial reporting.

3.      As such, it was the duty of the Defendants to monitor the collection, analysis and dissemination of the Company's financial results to avoid *any* violations of Generally Accepted Accounting Principles ("GAAP") and inaccurate reporting of Dana's financial results publicly, and particularly to avoid inaccuracies that would require the Company to restate its financial statements.

4.      Nevertheless, on September 15, 2005, Defendants announced that they would likely have to restate Dana's financial statements to correct the inappropriate recognition of certain price increases in the Company's commercial vehicle business.

2

5.    Three weeks later. Defendants affirmed that they would restate Dana's financial statements for 2004 and the first two quarters of 2005.

6.    The following week. Defendants announced that their restatement relating to improper recognition of certain price increases would cause the Company to further restate its financial results all the way back to 2000.   Although the Company stated this additional restatement was unrelated to its ongoing investigation of accounting improprieties relating to its commercial vehicle business, it nonetheless demonstrated further inadequacies in Dana's internal controls.

7.    As a result of Defendants' breach of their fiduciary duties and the resulting restatements. Dana's stock has tumbled from a high during the Relevant Period of $21.90 on April 27. 2004. to $6.78 on November 15, 2005.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2).   Diversity exists between the Plaintiff and each Defendant, and the amount in controversy exceeds $75,000.   This action is not a collusive one designed to confer jurisdiction on a court of the United States that it would not otherwise have.   This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

9.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) insofar as many of the acts and practices complained of herein occurred in this District and the nominal Defendant. Dana, is headquartered in this District.

3

## THE PARTIES

10.    Plaintiff Traute Weidman ("Plaintiff"), is, and was at times relevant hereto, an owner and holder of Dana common stock. Plaintiff is a citizen of Pennsylvania.

11.    Nominal Defendant Dana is a corporation organized and existing under the laws of Virginia, with its headquarters located in this District at 4500 Dorr Street, Toledo, Ohio.

12.    Defendant Michael J. Burns ("Burns") is, and has been since March 2004, Dana's Chief Executive Officer ("CEO"), President, and a member of its Board of Directors. Beginning in April 2004, Burns also became Chairman of Dana's board and the Company's Chief Operating Officer ("COO"). Burns knew, or recklessly failed to know, the below-described adverse non-public information about the business of Dana, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. For his employment in 2004, Dana paid Burns $825,000 in salary, a $1 million bonus, $3.53 million in restricted stock awards, as well as other compensation worth $393,753, a one time initial credit of $5.9 million as a supplemental retirement benefit, and an award of 510,000 options. In all, the Company paid Burns at least $11.65 million in compensation and benefits in 2004, not including the value of his 510,000 options. Burns is a citizen of Ohio.

13.    Defendant Robert C. Richter ("Richter") is, and at all relevant times has been, Dana's Chief Financial Officer ("CFO"). Because of his position as Dana's CFO, he knew, or recklessly failed to know, the below-described adverse non-public information about the business of Dana, as well as its finances, markets and its internal accounting controls, via access to internal corporate documents, and conversations and connections with other corporate officers

and employees. For his employment in 2004, Dana paid Richter $539,000 in salary, a $159,000 bonus, $157,000 in restricted stock awards, and awarded him 34,000 options. In all, the Company paid Richter more than $855,000 in compensation and benefits, not including the value of his 34,000 options. Richter is a citizen of Ohio.

14.     Defendant Benjamin F. Bailar ("Bailer") was a member of Dana's board of directors until April 2005. While on the board, Bailar served as Chairman of the Governance and Nominating Committee and was a member of the Audit Committee. Because of Bailer's position on the board, he knew, or recklessly failed to know, the below-described adverse non-public information about the business of Dana, as well as its finances, markets and its internal accounting controls, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Bailer is a citizen of Texas.

15.     Defendant Glen H. Hiner ("Hiner") was a member of Dana's board of directors until April 2005. While on the Board, Hiner served as Chairman of the Finance Committee and also served as Chairman of the board from September 2003 until April 2004. Because of Hiner's position on the board, he knew, or recklessly failed to know, the below-described adverse non-public information about the business of Dana, as well as its finances, markets and its internal accounting controls, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Hiner is a citizen of Ohio.

16.     Defendant Richard M. Gabrys ("Gabrys") joined Dana board of directors in December 2004, and remains a member of the board and member of the board's Audit and Finance Committees. Because of Gabrys' position on the board, he knew, or recklessly failed to know, the below-described adverse non-public information about the business of Dana, as well as its finances, markets and its internal accounting controls, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Gabrys is a citizen of Michigan.

17.     Defendant James P. Kelly ("Kelly") joined the Board of Directors of Dana in 2002, and remains a member of the board and the board's Finance and Compensation Committees. Because of Kelly's position on the board, he knew, or recklessly failed to know, the below-described adverse non-public information about the business of Dana, as well as its finances, markets and its internal accounting controls, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Kelly is a citizen of Georgia.

18.     Defendant Richard B. Priory ("Priory") joined Dana's Board of Directors in 1996, and remains a member of the board. Priory chairs the board's Compensation Committee and is a member of its Finance Committee. Because of Priory's position on the board, he knew, or recklessly failed to know, the below-described adverse non-public information about the business of Dana, as well as its finances, markets and its internal accounting controls, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at board of directors' meetings and committees thereof and via reports

6

and other information provided to him in connection therewith. Priory is a citizen of North Carolina.

19.     Defendant Samir G. Gibara ("Gibara") joined Dana's Board of Directors in February 2004. and remains a member of the board and the board's Audit and Governance and Nominating Committees. Because of Gibara's position on the board. he knew. or recklessly failed to know. the below-described adverse non-public information about the business of Dana, as well as its finances. markets and its internal accounting controls. via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Gibara is a citizen of Ohio.

20.     Defendant David Berges ("Berges") joined Dana's Board of Directors in February 2004. and remains a member of the board and the board's Finance and Compensation Committees. Because of Berges's position on the board. he knew, or recklessly failed to know, the below-described adverse non-public information about the business of Dana. as well as its finances, markets and its internal accounting controls, via access to internal corporate documents. conversations and connections with other corporate officers and employees, attendance at board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Berges is a citizen of Connecticut.

21.     Defendant Cheryl W. Grise ("Grise") joined Dana's Board of Directors in 2002, and remains a member of the board and the board's Audit and Governance and Nominating Committees. Because of Grise's position on the board, he knew, or recklessly failed to know, the below-described adverse non-public information about the business of Dana. as well as its finances. markets and its internal accounting controls. via access to internal corporate

7

documents, conversations and connections with other corporate officers and employees, attendance at board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Grise is a citizen of Connecticut.

22.     Defendant A. Charles Baillie ("Baillie") joined Dana's Board of Directors in 1998, and remains a member of the board and the board's Finance and Compensation Committees. Because of Baillie position on the board. he knew, or recklessly failed to know, the below-described adverse non-public information about the business of Dana, as well as its finances. markets and its internal accounting controls. via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Baillie is a citizen of Toronto. Canada.

23.     Defendant Marilyn R. Marks ("Marks") joined Dana's Board of Directors in 1994. and remains a member of the board and the board's Audit and Governance and Nominating Committees. Because of Marks's position on the board, he knew, or recklessly failed to know. the below-described adverse non-public information about the business of Dana, as well as its finances, markets and its internal accounting controls. via access to internal corporate documents. conversations and connections with other corporate officers and employees, attendance at board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Marks is a citizen of Colorado.

24.     Defendant Edmund M. Carpenter ("Carpenter") joined Dana's Board of Directors in 1991. and remains a member of the board and the board's Audit and Governance and Nominating Committees. Because of Carpenter's position on the board. he knew, or recklessly failed to know. the below-described adverse non-public information about the business of Dana,

as well as its finances, markets and its internal accounting controls, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Carpenter is a citizen of Connecticut.

25. Defendants Bailar, Hiner, Gabrys, Kelly, Priory, Gibara, Berges, Grise, Baillie, Marks, and Carpenter are and/or were the non-management directors of Dana.

26. Each of Dana's non-management directors received an annual retainer of $40,000 for 2004. In addition, the Chairmen of the Audit and Compensation Committees received a retainer of $15,000 and the remaining members of those committees each received an annual retainer of $5,000. The Chairmen of the Finance and Governance and Nominating Committees received a retainer of $10,000 and the remaining members of those committees each received an annual retainer of $2,500. Each non-management director also received $1,500 for each board meeting they attended in person and $1,000 for each meeting they attended telephonically. Finally, each non-management director was given an annual award of $75,000 worth of Company stock or its cash equivalent. Accordingly, Dana paid each of the non-management director defendants at least $120,000 for their services in 2004.

27. Defendants Burns, Richter, Bailar, Hiner, Gabrys, Kelly, Priory, Gibara, Berges, Grise, Baillie, Marks, and Carpenter are referred to herein as the "Individual Defendants."

28. By reason of their positions as directors, and with regard to some, Officers, and/or fiduciaries of Dana, the Individual Defendants owed Dana and its shareholders fiduciary obligations of trust, loyalty, due care, good faith, and fair dealing and were and are required to use their utmost ability to control Dana in a fair, just, honest and equitable manner.

9

29.     Each director and officer of the Company owes to Dana and its shareholders the fiduciary duty to exercise due care and good faith and diligence in the administration of the Company's affairs, and the highest obligations of fair dealing. In addition, as directors of a publicly held company, the Individual Defendants had a duty to insure that the Company had sufficient internal controls to ensure that it promptly disseminated accurate and truthful information with regard to the Company's financial results, and that the Company had adequate corporate checks to protect against the accounting improprieties at the Company, as described below.

30.     To discharge their duties, the directors of Dana were required to exercise reasonable and prudent supervision over management, and the Company's policies, practices and financial controls. By virtue of such duties, the Dana directors were required to, among other things:

(a)     Ensure that an adequate system of internal controls was in place such that Dana complied with GAAP and financial results were reported accurately;

(b)     Ensure that the Company had adequate corporate checks in place to ensure the Company was in compliance with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)     Ensure that management was conducting the affairs of the Company in an efficient, business-like manner to make it possible to provide the highest quality performance of its business, and to maximize the value of the Company's stock; and

(d)     Remain informed as to how Dana conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make

reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws.

31.     The conduct of the Individual Defendants complained of herein involves a reckless and/or knowing violation of their obligations as directors and officers of Dana, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

32.     The Individual Defendants breached their fiduciary duties by failing to implement an adequate system of internal controls, which failure caused the Company to misrepresent its financial condition. In addition, as a result of certain improper actions and course of conduct during the Relevant Period, the Company is now the subject of several class action lawsuits that allege violations of the federal securities laws. As a result, Dana has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b)     Costs incurred in investigating and defending Dana and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy any adverse judgments.

33.     Moreover, these actions have irreparably damaged Dana's corporate image and goodwill. For at least the foreseeable future, Dana will suffer from what is known as the "liar's discount," a term applied to the stocks of companies implicated in illegal behavior and that

11

misled the investing public, such that Dana's ability to raise equity capital or debt on favorable terms in the future is now impaired.

34.     During all times relevant hereto, the Individual Defendants breached their fiduciary duties to Dana's shareholders by failing to prevent financial statements from being issued that misrepresented to the investing public, including shareholders of Dana, the Company's actual financial results; and failing to prevent and/or adequately investigate the Company's violations of GAAP, all as set forth herein.

## BACKGROUND

35.     Dana engages in the engineering, manufacture, supply, and distribution of systems and components for vehicle manufacturers worldwide. It operates in two segments, the Automotive Systems Group (ASG) and the Heavy Vehicle Technologies and Systems Group (HVTSG).    The ASG segment manufactures and sells drivetrain modules, systems, and components, consisting of axles, driveshafts, structures, and chassis and steering products for the automotive and light vehicle markets, as well as driveshafts for the commercial vehicle market. It also provides sealing, thermal management, fluid transfer, and engine power products for the automotive, light and commercial vehicle, and leisure and outdoor power equipment markets; and systems assembly, management, and integration services and related service parts.    The HVTSG segment offers axles, brakes, driveshafts, chassis and suspension modules, ride controls, and related modules and systems for the commercial and off-highway vehicle markets; and transaxles, transmissions, and electronic controls for the off-highway market.

### Statements Issued During The Relevant Period

36.     On April 21, 2004, Dana issued a press release with the headline "Dana Corporation Reports Stronger First-Quarter Results." Therein, the defendants stated:

12

Dana Corporation (NYSE: DCN) today announced that its 2004 first-quarter sales were $2.3 billion compared to $2.0 billion during the same period last year. Net income for the quarter totaled $63 million. or 42 cents per share. compared to net income of $41 million, or 28 cents per share, for the period in 2003. First-quarter 2004 net income included $2 million of unusual net gains on the sale of Dana Credit Corporation (DCC) assets, while income during the same period last year included $10 million in comparable gains.

"We are very pleased with the continued progress demonstrated by our first-quarter performance," said Dana Chairman and CEO Mike Burns.  "Our profit improvement was driven by a combination of higher production volumes, new business programs, and the continued realization of benefits from our restructuring and other cost-reduction efforts."

First-quarter sales were up 17 percent over the comparable period last year.  While 2004 sales benefited from $125 million of currency translation, the majority of the sales increase was driven by new business programs and higher production volumes in the principal markets served by Dana, particularly the North American heavy-truck sector.

Profit from continuing operations -- those operations not included in the company's proposed divestiture of its aftermarket business -- was $50 million, or 33 cents per share. in the first quarter of 2004, compared to $36 million or 25 cents per share during the first quarter of 2003.  Excluding the unusual gains from DCC asset sales, this represents an 85 percent quarter-over-quarter improvement.

"Our improved profitability was evident in a higher operating margin," Mr. Burns said.  "In fact, our margin improvement would have been even better if not for continued launch-related costs in our structures group.  While these costs are not yet fully behind us. we took further actions to address the remaining issues in the first quarter and are confident that we will see improvement in the second quarter."

Aftermarket Business Performance Improved
Dana also saw improved results from its automotive aftermarket business. which is accounted for as a "discontinued operation" and targeted for divestiture by June 30. Bottom-line performance in the aftermarket business currently held for sale improved from $10 million in the first quarter of 2003 to $13 million in the first

quarter of this year. Income from discontinued operations reported for the first quarter of 2003 included a $5 million loss from the company's engine management business. which was sold in June 2003.

Cash Flow Improved
Dana Chief Financial Officer Bob Richter said. "While we experienced our normal seasonal build-up in working capital, the increase in net debt was less than during the comparable period last year. due to stronger earnings and the receipt of more than $70 million in tooling reimbursements from our customers.

"During the quarter, we paid off $231 million in maturing bonds." he added. "So. exclusive of DCC's obligations, our next scheduled maturity of long-term debt does not occur until 2008.

"DCC also reduced its debt as it continues to work down its portfolio through scheduled payments and asset sales," he added. "During the first quarter, the DCC portfolio was reduced by another $100 million. at a net gain of $2 million. This brings the total asset reduction since we began the DCC asset sale program in October 2001 to $940 million. with a cumulative net after-tax gain of $68 million."

Business Unit Combination Leverages Resources for Automotive Customers Dana recently announced the combination of its Automotive Systems and Engine and Fluid Management groups into a single business unit retaining the Automotive Systems Group name. The move is designed to better leverage Dana's resources to benefit its automotive customers. while also enhancing its own focus on profitable growth with these customers. The new Automotive Systems Group provides Dana with a focused $5.9 billion business integrating the company's product offerings to light-vehicle original equipment manufacturers. All of Dana's segment disclosures now reflect the combination of these business units.

Dana Reiterates Full-Year EPS Guidance "While we are pleased with our continued progress. we recognize that we still have much work to do," Mr. Burns said. "Specifically. we will increase our customer focus to achieve top-line growth and better leverage our capabilities in areas like purchasing to achieve greater economies of scale. "The first quarter was not without its challenges, including launch costs and industry-wide steel surcharges." he added. "And yet, we met our expectations in spite of these challenges. There will always be bumps in the road. but we remain

committed to achieving our goal of earnings per share of at least $1.90 in 2004."

37.     On April 29. 2004, Dana filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Richter and reaffirmed its previously announced financial results.

38.     The Form 10-Q also contained the following statement regarding the Company's internal controls:

> *Disclosure Controls and Procedures* — Our Chief Executive Officer (CEO) and Chief Financial Officer (CFO) have evaluated Dana's disclosure controls and procedures. as defined in the SEC rules, as of the end of the first quarter and have concluded that such controls and procedures are effective in providing reasonable assurance that material information relating to Dana and its consolidated subsidiaries was made known to them during the period covered by this report.
>
> *Internal Controls* — Our CEO and CFO are responsible for the accuracy of the financial information that is presented in this report. To meet their responsibility for financial reporting. they have established internal control procedures which they believe are adequate to provide reasonable assurance that Dana's financial statements are reliable and prepared in accordance with generally accepted accounting principles in the United States and that the company's assets are protected from loss. These procedures are reviewed by Dana's internal auditors in order to monitor compliance and by the independent auditors as necessary to support their audit work. In addition, our Audit Committee. which is composed entirely of independent directors, meets regularly with management. our internal auditors and the independent auditors to review accounting. auditing and financial matters. The Audit Committee and the independent auditors have free access to each other. with or without management being present.
>
> In the first quarter. we continued our review of our internal control documentation in preparation for management's assessment of internal control over financial reporting and the accompanying independent auditors' attestation report that will be a part of our annual report on Form 10-K for the fiscal year ended December 31. 2004.

There were no changes in Dana's internal controls over financial reporting identified in connection with the evaluation by the CEO and CFO that occurred during Dana's first quarter that have materially affected or are reasonably likely to materially affect Dana's internal controls over financial reporting.

39. On July 21, 2004, Dana issued a press release with the headline "Dana Corporation Reports Significantly Improved Operational Results." Therein, the defendants stated:

Dana Corporation (NYSE: DCN) today announced that its 2004 second-quarter sales were $2.3 billion, compared to $2.0 billion during the same period last year. Net income for the quarter (including $33 million of unusual net gains) totaled $108 million, or 72 cents per share. This compares to net income (including $5 million of unusual net gains) of $52 million, or 35 cents per share, for the period in 2003.

"We are pleased to have delivered another solid quarter of operational performance with net income, exclusive of unusual items, up 60 percent," said Dana Chairman and CEO Mike Burns. "At the same time, we're far from satisfied and continue to pursue greater focus, integration, and productivity in line with our commitment to meeting the needs of our global customers."

Second-quarter sales were up 16 percent over the same period last year with the majority of the increase being driven by our new business programs and higher production volumes in the principal markets served by Dana, particularly the North American heavy-truck sector.

"Our solid sales growth contributed to stronger bottom-line results," Mr. Burns said. "In addition, we continued to see growth in our gross margin - both year-over-year and sequentially by quarter - as we achieved further cost efficiencies and made progress in addressing the launch costs associated with our structures programs. It's important to note that these improvements were achieved in spite of the higher cost of steel and certain other raw materials that we experienced during the quarter.

"We are also enthused by the positive strategic and financial flexibility that we will have when we complete the sale of our automotive aftermarket business," Mr. Burns said. On July 9, Dana announced that it had reached a definitive agreement to sell

its automotive aftermarket business to The Cypress Group for approximately $1.1 billion in cash.

Transactions Trigger Recognition of $33 Million of Unusual Net Gains

The $33 million of unusual net gains included in the second quarter of 2004 included the recognition of $38 million in anticipated tax benefits triggered by the sale of the automotive aftermarket business and transactions that are part of the continuing program to divest assets of Dana Credit Corporation (DCC), which are expected to close during the third quarter. This was partially offset by $5 million of transaction-related expenses.

Dana Vice President and Chief Financial Officer Bob Richter explained. "These transactions are expected to generate capital gains. We had capital loss carryforwards from prior periods that were fully reserved. Since we now expect to be able to use the carryforwards to offset the gains, accounting rules require us to recognize the anticipated tax benefit by releasing a portion of the reserve at this time. "While we're happy to benefit from the additional income, we're pleased that even without these unusual items, we still achieved second-quarter net profit of $75 million, or 50 cents per share, which is up substantially over the prior year."

First-Half Results Significantly Improved

Dana's six-month consolidated sales were $4.6 billion, up from $4.0 billion during the same period last year. Net income during the first half of 2004 was $171 million, or $1.14 per share, including $35 million in unusual net gains. This compares to net income of $93 million, or 63 cents per share, including $15 million in unusual net gains during the initial six months of 2003.

"Excluding our unusual items and the results of businesses held for sale, our net income from continuing operations improved by more than 60 percent during the first half of 2004, compared to the same period last year," Mr. Burns said. "Again, this improvement was largely the result of new business and strong production volumes in our principal markets."

Full-Year EPS Guidance

"While we are optimistic about production levels in the North American heavy-truck sector, the second half of the year will not be without its challenges." Mr. Burns said. "We will continue to be impacted by many of the challenges that we experienced during the first six months of the year, particularly higher raw material costs. In addition, rising North American light-vehicle inventory

17

levels also point to the potential for reductions in production schedules in that sector during the second half of the year.
"So even though we will continue to consolidate the results of the automotive aftermarket business until the sale closes, we are not changing our earnings guidance of at least $1.90 per share. excluding unusual items. in 2004."

40.    On July 26. 2004, Dana filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Richter and reaffirmed its previously announced financial results.

41.    The Form 10-Q also contained the following statement regarding the Company's internal controls:

> *Disclosure Controls and Procedures* – Our Chief Executive Officer (CEO) and Chief Financial Officer (CFO) have evaluated Dana's disclosure controls and procedures, as defined in the SEC rules. as of the end of the second quarter and have concluded that such controls and procedures are effective in providing reasonable assurance that material information relating to Dana and its consolidated subsidiaries was made known to them during the period covered by this report.
>
> *Internal Controls* – Our CEO and CFO are responsible for the accuracy of the financial information that is presented in this report. To meet their responsibility for financial reporting, they have established internal control procedures which they believe are adequate to provide reasonable assurance that Dana's financial statements are reliable and prepared in accordance with generally accepted accounting principles in the United States and that the company's assets are protected from loss. These procedures are reviewed by Dana's internal auditors in order to monitor compliance and by the independent auditors as necessary to support their audit work. In addition. our Audit Committee, which is composed entirely of independent directors, meets regularly with management, our internal auditors and the independent auditors to review accounting. auditing and financial matters. The Audit Committee and the independent auditors have free access to each other, with or without management being present.
>
> During the second quarter. we continued to document our financial and related information systems (IS) controls. Testing of controls

at the facility level of our continuing operations began during the quarter and we are approximately 40% complete with that testing. Testing of the corporate level controls will begin in the third quarter. A process for evaluating exceptions identified during testing has been developed to determine their potential significance. The most frequent exceptions identified to date have been in the areas of documentation and segregation of duties. In the IS area, the most common exceptions have related to access controls and change controls. The process for evaluating identified exceptions includes an assessment of which exceptions have the potential, if not remediated, to become significant deficiencies or material weaknesses – either individually or when aggregated. We are currently expecting to remediate most of these exceptions and, to date, we have not identified any which we believe represents a material weakness. We have implemented processes to track the identified exceptions, monitor remediation plans and re-test for control effectiveness.

There were no changes in Dana's internal controls over financial reporting identified in connection with the evaluation by the CEO and CFO that occurred during Dana's second quarter that have materially affected or are reasonably likely to materially affect Dana's internal controls over financial reporting.

42. On October 12, 2004, Dana revised its 2004 earnings expectations from $1.90 per share to a range of $1.60 to $1.65 per share, excluding non-recurring items. Commenting on this, defendant Burns stated:

> "Like most in our industry, we are being impacted by the rising cost of steel and other raw materials, as well as reduced North American light-vehicle production volumes. Both factors are contributing to lower-than-expected operating results, not only in our original equipment business, but also in the automotive aftermarket business.
>
> We had expected that the bottom-line impact of these factors could be offset by the stronger performance in our heavy vehicle business and continuing cost-reduction efforts. But, given more recent trends in commodity prices and light-vehicle production volumes, it's now clear that we will see a negative effect on our 2004 earnings[.] . . . It's also clear that this effect will be more pronounced in the fourth quarter, since our third- quarter results will reflect a benefit from favorable tax developments."

19

43.     On October 20, 2004, Dana issued a press release with the headline "Dana Corporation Reports Third-Quarter Earnings." Therein, the defendants stated:

> Dana Corporation (NYSE: DCN) today announced third-quarter sales of $2.1 billion, compared to $1.9 billion during the same period last year. Net income for the quarter totaled $40 million, or 27 cents per share, compared to $61 million, or 41 cents per share, for the period in 2003.
>
> Net unusual charges for the quarter totaled $20 million. This amount includes net gains resulting from the sale of Dana's interest in certain assets and technology to a joint venture with the Knorr-Bremse Group and the company's continued program of divesting assets of its Dana Credit Corporation (DCC) operation. These gains were more than offset by charges primarily associated with the sale of Dana's automotive aftermarket businesses, including the reversal of an anticipated tax benefit of $20 million which was recognized in the second quarter of 2004. Based on our current expectations of the effect of the transaction, which is now anticipated to close in November, recognition of this tax benefit is no longer warranted.
>
> Excluding unusual items, third-quarter 2004 net income was $60 million, or 40 cents per share, compared to $43 million, or 29 cents per share for the period last year. Third-quarter 2004 results, however, included the impact from several positive tax developments, including the adjustment of the company's effective tax rate for the year to 31 percent. The reduction in the effective rate reflects, among other items, credits for research and development costs. In addition, a tax benefit of $24 million was recorded to recognize the utilization of capital loss carryforwards related to the settlement of certain issues with tax authorities, as well as adjustments associated with the finalization of the prior-year's tax returns.
>
> "Setting aside taxes, it was an otherwise disappointing quarter, largely because of the increasing cost of raw materials," said Dana Chairman and CEO Mike Burns. "The increase in steel costs alone totaled $22 million after tax, net of recoveries from our customers.
>
> "We had expected that the bottom-line impact of the commodity price increases would be offset by the stronger performance in our heavy-vehicle business and continuing cost-reduction efforts," he added. "But, the magnitude of the raw material increases, coupled with a decrease in light-vehicle production volumes, hit us harder than expected."

Nine-Month Results

Dana's nine-month consolidated sales were $6.8 billion, up from $5.9 billion during the same period last year. Net income during the first three quarters of 2004 was $215 million, or $1.43 per share, including $15 million in unusual net gains. This compares to net income of $154 million, or $1.04 per share, including $33 million in unusual net gains during the initial nine months of 2003.

"Looking at the year-to-date results, we were reasonably satisfied with the performance from our Heavy Vehicle Technologies and Systems Group, which benefited from a solid commercial vehicle market in North America, and strong global off-highway vehicle production." Mr. Burns said. "It was a different story in our Automotive Systems Group. Although their sales were up, about 30 percent of the sales increase resulted from currency translation and new programs in our structures group, which are only beginning to contribute to the bottom line. Additionally, the automotive group bore the brunt of the increased steel costs."

Looking Ahead

On Oct. 12, Dana revised its expectation for 2004 earnings per share, excluding unusual items, from $1.90 per share to a range of $1.60 to $1.65 per share. The full-year effect of unusual items, such as the sale of DCC assets and the divestiture of the company's automotive aftermarket businesses, cannot reasonably be quantified at this time and was excluded from this guidance.

"We believe that raw material costs will continue to adversely affect us, at least in the near term," Mr. Burns said. "As we move into 2005, however, we can expect more of an offsetting benefit from our cost reduction programs. These include the consolidation of our purchasing function, the accelerated deployment of lean manufacturing techniques, and the standardization of administrative processes throughout the company.

"At the same time, we are not solely focused on cutting costs," he said. "We are equally committed to growing our top line faster - we've added significantly to our book of new business over the last three months, the heavy-truck and off-highway markets continue to grow, and we are focused on expanding our global footprint."

44.    On November 9, 2004, Dana filed its quarterly report with the SEC on Form 10-

Q. The Company's Form 10-Q was signed by defendant Richter and reaffirmed its previously

announced financial results.

45.    The Form 10-Q also contained the following statement regarding the Company's

internal controls:

> *Disclosure Controls and Procedures* – Our Chief Executive
> Officer (CEO) and Chief Financial Officer (CFO) have evaluated
> Dana's disclosure controls and procedures, as defined in the SEC
> rules, as of the end of the third quarter and have concluded that
> such controls and procedures are effective in providing reasonable
> assurance that material information relating to Dana and its
> consolidated subsidiaries was made known to them during the
> period covered by this report.
>
> *Internal Controls* – Our CEO and CFO are responsible for the
> accuracy of the financial information that is presented in this
> report. To meet their responsibility for financial reporting, they
> have established internal control procedures which they believe are
> adequate to provide reasonable assurance that Dana's financial
> statements are reliable and prepared in accordance with generally
> accepted accounting principles in the United States and that the
> company's assets are protected from loss. These procedures are
> reviewed by Dana's internal auditors in order to monitor
> compliance and by the independent auditors as necessary to
> support their audit work. In addition, our Audit Committee, which
> is composed entirely of independent directors, meets regularly with
> management, our internal auditors and the independent auditors to
> review accounting, auditing and financial matters. The Audit
> Committee and the independent auditors have free access to each
> other, with or without management being present.
>
> During the third quarter of 2004 testing of controls at our
> significant operating facilities was completed for both financial
> and information systems (I.S.) controls. We are in the process of
> remediating the exceptions found and conducting re-tests where
> necessary to ensure that proper controls are in place. Those
> exceptions identified as having the most significance will be given
> priority in terms of re-testing. The most frequent exceptions have
> been found in the area of account reconciliations, formal review
> and approvals, segregation of duties, and documentation. Limited

testing of corporate level controls has been done. Corporate level controls will be tested during the fourth quarter and some testing may need to be done in early 2005. Management is continuously assessing the results of testing to determine if exceptions that have not been remediated might rise to the level of significant deficiencies or represent a material weakness. The results of corporate level control testing and exceptions that have not been remediated will be considered at year end to determine whether significant deficiencies or a material weakness exists at that time.

There were no changes in Dana's internal controls over financial reporting identified in connection with the evaluation by the CEO and CFO that occurred during Dana's third quarter that have materially affected or are reasonably likely to materially affect Dana's internal controls over financial reporting.

46. On February 23, 2005, Dana issued a press release with the headline "Dana Corporation Reports Fourth-Quarter and Full-Year Results..." Therein, the defendants stated:

Dana Corporation (NYSE: DCN) today announced its fourth-quarter and full-year 2004 results. During the fourth quarter, Dana took a series of actions aimed at strengthening its long-term competitiveness and repositioning the company to better serve its global original equipment customers. These actions, which together resulted in unusual charges of $195 million after tax, included:

- Completing the divestiture of the automotive aftermarket businesses previously held for sale;
- Announcing two facility closures and other manufacturing realignments; and
- Repurchasing approximately $900 million of long-term debt.

"The aftermarket divestiture, our realignment actions, and the debt repurchase significantly improved our balance sheet and financial flexibility. Our efforts were recognized by two leading credit agencies, which returned us to investment grade in December." said Dana Chairman and CEO Mike Burns. "In addition, year-over-year sales and net income, excluding unusual items, were both up significantly despite a challenging operating environment.

"Certainly, we're not yet where we'd like to be. But the improvements to our balance sheet and operational performance were important steps in the continuing transformation of Dana, and I am proud of what our people accomplished in 2004."

Fourth-Quarter Results

Dana posted fourth-quarter sales of $2.3 billion in 2004, compared to $2.1 billion in the same period of 2003. This increase was primarily due to new business and strong sales to commercial vehicle customers, while favorable currency effects added $73 million.

Including unusual charges for the aftermarket divestiture, manufacturing realignments, and debt repurchase, Dana recorded a net loss of $133 million, or 89 cents per share, in the quarter, compared to net income of $68 million, or 45 cents per share, in the same period of 2003. Excluding unusual charges, net income for the quarter was $62 million in 2004, compared to the same amount in the fourth quarter of 2003.

Earnings in the fourth quarter were negatively impacted by the continuing effects of higher raw material prices. Net of customer recoveries, the increased cost of steel alone reduced earnings by $31 million after tax, compared to the same period in 2003. Favorably impacting the 2004 results were tax benefits that resulted primarily from the company's ability to reduce valuation allowances provided against deferred tax assets in prior periods.

Dana Vice President and Chief Financial Officer Bob Richter explained, "While reported income was greater than expected, this was largely due to greater than anticipated tax benefits. More important for the long term were the actions taken to strengthen our financial position. We improved our net debt-to-capital ratio, excluding Dana Credit Corporation, from 47 percent at the start of the quarter -- and 61 percent less than three years ago -- to less than 35 percent. This improvement will be reflected in reduced interest expense going forward. We also made an extra contribution of approximately $200 million to our pension plans, which will reduce future expense and contribution requirements. And, we are no longer limited by high-yield covenants on our debt. All of this will enable us to better capitalize on future growth opportunities."

Full-Year Results

Sales increased to $9.1 billion in 2004 from $7.9 billion in 2003, primarily due to net new business of over $400 million, strong commercial and off-highway vehicle markets, and favorable currency effects of $300 million.

Full-year net income was $82 million, or 54 cents per share, compared to $222 million, or $1.49 per share, in 2003. Unusual

items of $180 million in 2004 included the $195 million of charges recorded in the fourth quarter plus $15 million of net gains reported earlier in the year. Net income in 2003 included $39 million of unusual gains on divestitures and debt repurchases.

Excluding unusual items, net income in 2004 was $262 million, or $1.73 per share, compared to $183 million, or $1.23 per share, in 2003. The margin on higher sales and benefits from the company's cost-reduction initiatives. as well as tax benefits, more than offset the impact of increased raw material costs.

"Despite very challenging industry conditions. we made good progress year over year." said Burns. "We had to contend with increased steel costs, which net of recoveries was $70 million after tax, mostly in the second half of year. We also saw a small decline in North American light vehicle production. Fortunately, we had the benefit of new business. strong commercial and off- highway vehicle markets, and the early returns from our cost-reduction initiatives. In particular. during 2004, we consolidated our light vehicle business units and centralized our purchasing organization for greater buying leverage."

2005 Outlook
"This will be another tough year for the automotive industry as well as Dana." said Burns. "We believe North American light vehicle production will be flat at 15.8 million units. We expect to see continuing pressure on raw material prices and energy costs. particularly in the first half of the year. And. as a company, we will also face the near-term challenge of replacing the lost earnings from the automotive aftermarket businesses that were sold. as well as the reduced earnings contribution from Dana Credit Corporation as we continue to wind that business down.

"On the other hand. we have renewed our focus on our global original equipment manufacturers. In fact. we already have an additional $410 million in net new business, which comes on in 2005. And we're very optimistic about the outlook for the commercial vehicle and off-highway markets. We're anticipating a 13 percent increase in North American Class 8 truck production to 293.000 units. The combination of these factors should allow us to increase our 2005 full-year sales to $9.6 billion.

"The increased sales alone, however. will not be enough to offset the challenges we face. So we will be relentless in pursuing our cost-reduction objectives. We will continue to deploy lean manufacturing and value engineering throughout the organization

and streamline our administrative processes. These efforts, along with better leverage from our consolidated purchasing function, are expected to gain more momentum and therefore provide greater benefit to our bottom line as the year progresses.

"We expect Dana's earnings to be lower in the first half of the year compared to last year mainly due to higher raw material prices. Therefore, we're anticipating first-quarter earnings of 17 to 23 cents per share. Our ability to achieve higher earnings in the second half of the year is largely dependent on the successful execution of our cost-reduction programs. At this time. our full-year earnings guidance is $1.40 to $1.62 per share." added Burns.

47.     On March 9, 2005. Dana filed its annual report with the SEC on Form 10-K. The

Company's Form 10-K was signed by each of the Individual Defendants and reaffirmed its

previously announced financial results.

48.     The Form 10-K included the following statement by the Company regarding its

internal controls:

> *Disclosure Controls and Procedures* — Our Chief Executive Officer (CEO) and Chief Financial Officer (CFO) have evaluated Dana's disclosure controls and procedures. as defined in the SEC rules. as of the end of the fourth quarter of 2004 and have concluded that such controls and procedures are effective.
>
> *Internal Control Over Financial Reporting* — Management is responsible for establishing and maintaining adequate internal control over financial reporting. In order to evaluate the effectiveness of internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act. management conducted an assessment, including testing. using the criteria in *Internal Control – Integrated Framework.* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management has concluded that, as of December 31, 2004. Dana's internal control over financial reporting was effective.
>
> PricewaterhouseCoopers LLP. the independent registered public accounting firm that has audited our financial statements included in our annual report. has issued an attestation report on our assessment. That report is included in the Report of Independent

Registered Public Accounting Firm at pages 43-44 of this annual report.

There were no changes in Dana's internal control over financial reporting identified in connection with the evaluation by the CEO and CFO that occurred during Dana's fourth quarter of 2004 that have materially affected or are reasonably likely to materially affect Dana's internal control over financial reporting.

49.     On March 18, 2005. Dana filed a proxy statement with the SEC on Form DEF-14A. The report was also distributed to Dana's shareholders in advance of the Company's April 18. 2005 annual meeting.  The proxy statement included the following report from the Audit Committee, which report was signed by Defendants Carpenter, Bailar, Gabrys, Gibara, Grise and Marks:

We have reviewed and discussed with management Dana's audited consolidated financial statements for the fiscal year ended December 31, 2004.

We have discussed with Dana's independent auditors. PricewaterhouseCoopers LLP (PricewaterhouseCoopers). the matters required to be discussed by Statement on Auditing Standards No. 61, *Communications with Audit Committees,* as amended.

We have received the written disclosures and the letter from PricewaterhouseCoopers required by Independence Standards Board Standard No. 1. *Independence Discussions with Audit Committees,* as amended. and we have discussed with PricewaterhouseCoopers its independence.

Based on the foregoing review and discussions, we have recommended to the Board of Directors that the audited financial statements referred to above be included in Dana's Annual Report on Form 10-K for the fiscal year ended December 31, 2004. to be filed with the Securities and Exchange Commission (SEC).

We have discussed with Dana's senior management and with PricewaterhouseCoopers the review of the company's reporting and internal controls undertaken in connection with certifications by the Chief Executive Officer and Chief Financial Officer

27

pursuant to the Sarbanes-Oxley Act of 2002 (Sarbanes-Oxley Act) in certain of Dana's filings with the SEC. We have also reviewed and discussed such other matters as we deem appropriate, including Dana's compliance with Section 404 and other provisions of the Sarbanes-Oxley Act and rules adopted or proposed by the SEC and the New York Stock Exchange.

The Board revised our Charter in July 2004, and a copy of the new Charter is included in this Proxy Statement as Exhibit A. The Board will continue to review our Charter annually and to make such revisions as it deems appropriate.

50.     On March 23, 2005, Dana issued a press release with the headline "Dana Corporation Revises Earnings Outlook." Therein, the defendants stated:

Dana Corporation (NYSE: DCN) today announced that it has revised its first-quarter 2005 earnings outlook to a range of 11 to 13 cents per share, from its previously announced range of 17 to 23 cents per share.

Dana Chairman and CEO Michael J. Burns said the reduction is primarily attributable to three factors:

  - Higher-than-expected material costs, including the effect of the increased cost of steel to Dana's suppliers and other factors;
  - A current component shortage from a principal supplier that has resulted in reduced shipments of heavy-duty axles; and
  - Lower-than-expected North American light-vehicle production rates on key platforms.

Mr. Burns added, "We are hopeful that we will see less pressure on material price increases during the balance of the year, but we can't count on this. We are accelerating our cost-reduction efforts to pull forward savings to offset the potential impact of continued pressure on material costs. Regarding the component shortage that has reduced heavy-duty axle shipments, we are working closely with the supplier to resolve the situation and are confident that we will see a substantial improvement in the second quarter. However, given the uncertain outlook for the light-vehicle industry in general, as well as on commodity prices, we feel it is prudent to lower our 2005 full-year guidance to $1.30 to $1.45 per share, from our previous guidance of $1.40 to $1.62 per share."

51.    On April 20, 2005, Dana issued a press release with the headline "Dana

Corporation Reports First-Quarter Results for 2005." Therein, the defendants stated:

> Dana Corporation (NYSE: DCN) today announced that its 2005
> first-quarter sales were $2.5 billion, compared to $2.3 billion
> during the same period last year. Net income for the quarter
> totaled $18 million, or 12 cents per share, versus $65 million, or 43
> cents per share, for the period in 2004.
>
> First-quarter 2004 net income included $13 million from the
> discontinued automotive aftermarket businesses that were sold in
> November, 2004. Additionally, first-quarter 2004 net income
> included $2 million of unusual net gains from the sale of Dana
> Credit Corporation assets, while unusual transactions in the first
> quarter of 2005 did not have a significant impact on net income.
>
> Dana Chairman and CEO Mike Burns said 2005 first-quarter
> earnings were impacted by several external factors. "The single
> greatest factor impacting our earnings was roughly $32 million in
> additional steel costs that we incurred compared to the first quarter
> of 2004," he said. "This is an after-tax number and is net of what
> we've recovered from our customers.
>
> "In addition, this year's results were affected by a component
> shortage from a principal supplier, which resulted in reduced
> shipments of heavy-duty axles in March," Mr. Burns said. "The
> component shortage also affected the operating efficiency in our
> Heavy Vehicle group and led to significantly higher levels of
> inventory on other related components.
>
> "Finally, the performance of our Automotive Systems Group was
> impacted by lower production on many of our key light vehicle
> platforms in North America.
>
> "Against this challenging backdrop, we are stepping up our focus
> on those items within our control," Mr. Burns said. "This means
> accelerating our cost-reduction actions to deliver savings to the
> bottom line, despite external challenges. We are also working hard
> to grow our top line. During the quarter, we were awarded net new
> business that will add approximately $60 million to full-year 2005
> sales."

Recent Actions Position Dana for Long-Term Success

Mr. Burns said Dana has also taken several recent actions that position the company to further leverage its capabilities and achieve success over the longer term:

* In February, Dana's principal Brazilian subsidiary, Dana-Albarus, initiated a tender offer in Brazil for the 15.8 percent of its outstanding shares not held by Dana. Completion of this offer will enable Dana to consolidate all profits from this business, while at the same time saving the administrative costs associated with operating a separate public company.

* In March, Dana announced an agreement to form a 50/50 joint venture in China - Dongfeng Dana Axle Co. Ltd. The joint venture is expected to be established in the third quarter of this year, following government approvals. Dana will initially have a $60 million net investment in the joint venture, which will provide axles - and potentially other driveline products - for the growing Chinese commercial vehicle market.

* Earlier this month, Dana and IBM announced an agreement for IBM Business Consulting Services to provide Dana with administrative services in the human resources area, such as payroll and benefits, compensation, and recruitment and training. This move is designed to improve Dana's flexibility in managing its human resource processes, as well as to deliver cost savings over the 10-year life of the contract.

Outlook

Commenting on the company's near-term outlook, Mr. Burns said, "Our full-year guidance remains $1.30 to $1.45 per share."

He continued, "As we put the recent component shortage behind us, and address other operational issues that have held back margin expansion in the Heavy Vehicle group over the past two quarters, we expect to more fully benefit over the remainder of the year from the strong demand anticipated in the North American commercial vehicle market.

"In the case of the Automotive Systems Group, the dominant issue has been the effect of higher steel prices," Mr. Burns added. "The good news is that the market price for raw steel has decreased in recent months and demand appears to be moderating. Although the price we pay for forgings and other parts with high steel content

30

> has been slow to follow the decrease for a variety of reasons, we remain hopeful that we'll see less pressure on steel and other material price increases during the balance of the year. Therefore. if light-duty production schedules for the balance of the year do not change significantly, we expect that our accelerated cost reduction efforts will lead to improved performance in this group as well."

52.    On May 6, 2005, Dana filed its quarterly report with the SEC on Form 10-Q. The Company then filed an amended Form 10-Q on May 13, 2005. Both Forms 10-Q were signed by defendant Richter and reaffirmed its previously announced financial results.

53.    The Forms 10-Q also contained the following statements regarding Dana's internal controls:

> Our Chief Executive Officer (CEO) and Chief Financial Officer (CFO) have evaluated Dana's disclosure controls and procedures. as defined in the SEC rules, as of the end of the first quarter and have concluded that such controls and procedures are effective.

> There were no changes in Dana's internal control over financial reporting identified in connection with the evaluation by the CEO and CFO that occurred during Dana's first quarter that have materially affected or are reasonably likely to materially affect Dana's internal controls over financial reporting.

54.    On July 20, 2005, Dana issued a press release with the headline "Dana Corporation Reports Second-Quarter Results." Therein. the defendants stated:

> Dana Corporation (NYSE: DCN) today reported financial results for the second quarter of 2005, which showed significant improvement over results for the first three months of the year. Second-quarter highlights included:

> - Sales of $2.6 billion were up 6 percent from the first quarter of 2005:
> - The addition of $215 million in net new business for the years 2005 to 2007 raised total net new business for this period to $1.3 billion;
> - Higher sales and cost savings drove operating profit improvements of 53 percent in the Automotive Systems Group and

31

48 percent in the Heavy Vehicle Technologies and Systems Group; and

- Net income, exclusive of unusual items, increased to $53 million, or 35 cents per share, compared to $18 million, or 12 cents per share, during the first three months of 2005. Unusual items in the second quarter included a net charge of $5 million related to enactment of new Ohio tax legislation and a $3 million net gain from the sale of certain Dana Credit Corporation (DCC) assets. With these unusual items, net income totaled $51 million, or 34 cents per share.

\*\*\*

"In the face of continuing industry-wide challenges, Dana people have made significant progress in strengthening our company," said Dana Chairman and CEO Mike Burns. "Specifically, our lean manufacturing and value engineering programs are delivering tangible results as evidenced by the substantial profit improvement from last quarter.

"Our cost reduction and efficiency programs are essential. But equally important to achieving our goals is our aggressive pursuit of steady top-line growth," Mr. Burns said. "To this end, we are extremely pleased to report that we have added another $215 million in the second quarter to our increasingly strong -- and diverse -- book of new business."

Second-Quarter Results
Second-quarter sales in 2005 were $2.6 billion, compared to $2.3 billion during the same period last year. Earnings from continuing operations for the quarter, excluding unusual items, totaled $53 million, or 35 cents per share, compared to $59 million, or 39 cents per share, on a similar basis during the second quarter of 2004.

Net unusual charges for the second quarter of 2005 totaled $2 million. This amount included a net charge of $5 million resulting from a change in the basis of Ohio corporate taxation enacted on June 30. The accounting treatment of this change impacted the company's deferred tax assets. This charge was partially offset by a $3 million gain from the company's ongoing divestiture of DCC leasing assets.

The second quarter of 2004 included net unusual gains of $33 million associated with the sale of DCC assets and a tax benefit that we expected to realize on the sale of the automotive aftermarket operations that was completed in November 2004.

Reported second-quarter 2004 net income. including net unusual gains. totaled $110 million. or 73 cents per share.

Business Unit Performance

The Heavy Vehicle Technologies and Systems Group continued to benefit from the strong commercial and off-highway markets. Its sales grew by 21 percent in the second quarter compared to the same period last year. Currency translation added $11 million to the group's sales for the second quarter of 2005. Automotive Systems Group sales for the second quarter of 2005 were up 10 percent versus the same period last year, with currency translation contributing $62 million.

Heavy Vehicle profits were up 19 percent compared to the second quarter of 2004. while Automotive Systems profits were down 15 percent over the same period. Second-quarter profits - particularly those of the Automotive Systems Group - were negatively impacted by approximately $27 million. after tax and net of customer recoveries, in additional steel costs Dana incurred compared to the second quarter of 2004. Additionally, 2005 profit after tax for the Heavy Vehicle group was favorably impacted by $4 million related to a decrease in the group's liability for warranty to reflect lower average claims costs.

2005 First-Half Results

Dana's six-month consolidated sales for 2005 were $5.1 billion. Income from continuing operations for the first half of 2005, excluding unusual items. was $71 million. or 47 cents per share. Including a net charge of $2 million for unusual items. net income for the six months was $69 million, or 46 cents per share.

In comparison, Dana's six-month consolidated sales for the first half of 2004 totaled $4.6 billion and income from continuing operations, excluding unusual items. was $109 million. or 72 cents per share. In this period. Dana reported income from discontinued operations of $48 million. or 32 cents per share. representing the automotive aftermarket businesses divested in November 2004. The $48 million included a $20 million tax benefit expected to be realized on the divestiture and a $3 million charge for divestiture-related expenses. Also during the first half of 2004, the company reported gains on the sale of DCC assets totaling $18 million. Including unusual items. net income for the first half of 2004 was $175 million.

Looking Ahead

"We are encouraged by the profit improvement we've achieved since last quarter," Mr. Burns said. "And we believe there is considerable opportunity to achieve additional cost savings and process efficiencies as our efforts gain more momentum.

"Production schedules for North American heavy trucks continue to be stronger than expected and, as a result, we are raising our estimate for full- year 2005 production to 310,000 units from 293,000 units. The off-highway market segments we serve are also expected to remain strong for the rest of the year," he said. "We're also expecting to benefit from subsiding steel costs, which will be particularly important to the Automotive Systems Group.

"However," Mr. Burns continued, "given the uncertainty surrounding North American light vehicle production in the second half of the year, we are lowering our 2005 production forecast to 15.5 million units from 15.7 million units. We are also concerned about the possible impact on sales if the dollar continues to gain strength. As a result, our earnings expectations for the full year remain unchanged at a range of $1.30 to $1.45 per share."

55. On July 29, 2005, Dana filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Richter and reaffirmed its previously announced financial results.

56. The Form 10-Q contained the following statements regarding Dana's internal controls:

*Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures* — Our Chief Executive Officer (CEO) and Chief Financial Officer (CFO) have evaluated Dana's disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended (the Exchange Act), and have concluded that such controls and procedures are effective as of the end of the period covered by this quarterly report.

*Changes in Internal Control over Financial Reporting* — On June 1, 2005, we outsourced certain of our human resources services to IBM. We have not yet fully tested internal controls applicable to this change. This change is part of our cost reduction

initiative for administrative costs. During 2005, we will perform appropriate testing to ensure the effectiveness of internal controls as they relate to the reliability of financial reporting and the preparation and fair presentation of our published consolidated financial statements.

There were no other changes that occurred during the quarter ended June 30, 2005 that have materially affected or are reasonably likely to materially affect Dana's internal control over financial reporting.

## The Inadequacy of Dana's Internal Controls Begins to Emerge

57.     On September 15, 2005, Dana announced it would likely restate second-quarter results to correct the inappropriate recognition of price increases in its commercial vehicle business during the period, a move that the Company said could reduce earnings by $10 million to $15 million. Dana also cut its full-year earnings forecast to about 60 cents to 70 cents a share from a range of $1.30 to $1.45 previously, excluding gains and losses on divestitures and asset sales, and other items. Before the announcement, analysts' average estimate for Dana's 2005 earnings stood at $1.20 a share.

58.     In reaction to this announcement, the price of Dana stock fell dramatically, from $12.78 per share on September 14, 2005 to $9.86 per share on September 15, 2005, a one-day drop of 22.8 percent on unusually heavy trading volume.

59.     On October 10, 2005, prior to the opening of the market, Dana announced that it would restate its 2004, first-quarter 2005, and second-quarter 2005 financial statements. Also, the Company stated that it had postponed its third-quarter 2005 earnings release and was withdrawing its earnings guidance for full-year 2005. More specifically, Dana stated:

> Dana's management and the Audit Committee of the Board of Directors have determined, as a result of their ongoing internal investigations, that the company did not properly account for certain items during 2004 and the first and second quarters of 2005. As a result, management and the Audit Committee have

concluded that Dana's financial statements for these periods should no longer be relied upon and that restatements will be required for these periods. The primary purpose for the restatements is to correct issues involving customer pricing and transactions with suppliers in Dana's Commercial Vehicle business.

The company's conclusions were reached in consultation with its independent registered public accounting firm, PricewaterhouseCoopers LLP, and independent investigators retained by the Audit Committee. The company will file amended reports on Forms 10-K/A and 10-Q/A for the periods being restated.

In connection with the restatements, the company believes that there are material weaknesses in its internal control over financial reporting.

The company has not completed its investigations. It has not determined whether it will be necessary to revise the estimated impact on second-quarter income of $10-15 million after tax, which it reported on Sept. 15, based on information available at that time from its preliminary review. It has also not determined what additional amounts will be required to adjust the statements for the other periods.

Company to Write Off U.S. Deferred Tax Assets

On Sept. 15, the company announced that it was evaluating its ability to maintain its U.S. deferred tax assets in light of the change in its earnings outlook. At June 30, the company reported that its U.S. deferred tax assets totaled approximately $740 million. The company now believes that it will be unable to maintain its U.S. deferred tax assets or to record similar tax benefits in the future. The company is assessing the impact of this on its financial statements. The write-off of the U.S. deferred tax assets and the inability to record similar tax benefits in the future has a direct negative impact on net income but does not impact the company's cash flow.

Company Assessing Impact on Financial Agreements

Following the announcement on Sept. 15 that it would likely restate its second-quarter financial statements, the company received certain necessary waivers under its five-year bank facility and its accounts receivable securitization agreement for the second quarter. The company also received a waiver of the financial

covenants under its bank facility for the third quarter. The company is now assessing the impact of the additional restatements and the decision to write off the U.S. deferred tax assets on its obligations under those credit facilities and other agreements.

Third-Quarter Earnings Release Postponed

As a result of the restatements. Dana will not release its third-quarter 2005 results on Oct. 19, as previously anticipated. At this time, no date has been set for the third-quarter release.

Operational and Strategic Actions Being Evaluated

The company continues to evaluate a number of significant measures, both operational and strategic, to improve its financial performance, and will make further announcements regarding its plans as soon as appropriate.

60.     In reaction to this announcement, the price of Dana stock fell dramatically, from

$9.19 per share on October 7, 2005 to $6.04 per share on October 10, 2005, a one-day drop of

34.28 percent, on unusually heavy trading volume.

61.     On October 18, 2005, Dana issued a press release announcing the impact of its

impending restatement.    In the release, Defendants increased the estimated size of the

restatement from the previously announced $10-15 million range to a substantially higher range

of $25-45 million.  Specifically, the Company stated:

Restatement Impact Estimated

Dana announced on Oct. 10 that its management and the Audit Committee of Dana's Board of Directors had determined, as a result of their ongoing internal investigation, that the company had not properly accounted for certain items during 2004 and the first and second quarters of 2005, and that the company would restate its financial statements for those periods. These conclusions were reached in consultation with Dana's independent registered public accounting firm. PricewaterhouseCoopers LLP, and independent investigators retained by the Audit Committee. The primary purpose for the restatements is to correct issues involving customer

37

pricing and transactions with suppliers in Dana's Commercial Vehicle business.

Although the investigation is not yet complete, and the effect of the above restatements may require the restatement of financial statements for prior periods, the company currently expects that the net aggregate reduction in net income for all periods to be restated will be between $25 million and $45 million after tax.

Financial Agreement Waivers Secured

Since Dana's announcement on Oct. 10 of its intention to restate its financial statements for 2004 and 2005 and its decision to write off its U.S. deferred tax assets, Dana has received additional necessary waivers through Nov. 30, 2005, under its principal bank facility and accounts receivable securitization agreement. The company is currently in discussion with its lenders regarding possible modifications to its existing facilities, as well as alternative financing arrangements.

The company is in the process of addressing possible non-compliance with covenants in two of its indentures and four leases with respect to furnishing financial statements in accordance with generally accepted accounting principles in the United States (GAAP). The company is continuing to assess the impact of these developments on its obligations under other leases and agreements.

Operational and Strategic Actions Being Evaluated

The company plans to make announcements later this week regarding operational and strategic measures to improve its financial performance.

62. On November 7, 2005, Dana filed a Form 12b-25 indicating that it would not be able to file its Form 10-Q in a timely manner. In the Form 12b-25, the Company stated:

Dana Corporation has determined that it will be unable to file its Form 10-Q for the quarterly period ended September 30, 2005, either by the November 9, 2005 due date or by November 14, 2005, and has therefore not requested the five-day extension permitted by the SEC's rules.

As reported in the company's Form 8-K dated October 14, 2005, Dana's management and the Audit Committee of its Board of Directors have determined, as a result of their ongoing internal

investigation, that the company had not properly accounted for certain items during 2004 and the first and second quarters of 2005 and that, as a result, the company will be required to restate its financial statements for those periods.

The investigation has not yet reached the point where these restatements can be completed. Until such time as the restatements are completed, Dana will not be in a position to finalize its financial statements for the quarter ended September 30, 2005, and to file the corresponding Form 10-Q.

63.     On November 15, 2005, Dana announced that its ongoing investigation of accounting improprieties relating to its commercial vehicle business had triggered a further restatement of the Company's financial statements for 2002 and 2003 and financial results for 2000 and 2001. Although the Company assured the market that these additional restatements would impact only the timing of reported income and would not effect the net aggregate reduction in net income, it was further evidence that the Company's internal controls were not adequate. Specifically, the Company stated:

Dana Corporation (NYSE: DCN) today provided additional information related to the status of the restatement of its financial statements and reaffirmed the expected impact of the restatement on aggregate net income for the periods affected.

With reference to its announcements of Oct. 10, 2005, and Oct. 18, 2005, relative to the restatement of its financial statements, Dana's management and the Audit Committee of the Board of Directors have determined that the restatement of its 2004 financial statements will trigger the accounting requirement to restate its financial statements for the years 2002 and 2003 and its financial results for the years 2000 and 2001. Consequently, Dana's financial statements for 2002 and 2003 and financial results for 2000 and 2001 can no longer be relied upon.

The items requiring the restatements of the years prior to 2004 are unrelated to the company's ongoing internal investigation. The restatement for these items will impact only the timing of reported income, and not the cumulative net income in the periods affected. Therefore, Dana still expects that the net aggregate reduction in net income after tax for all periods to be restated will remain in the

$25 million to $45 million range. which was previously announced.

The company's conclusions were reached in consultation with its independent registered public accounting firm, PricewaterhouseCoopers LLP, and independent investigators retained by the Audit Committee.

Amended SEC Reports

Dana is in the process of preparing amended reports on Forms 10-Q/A for the first two quarters of 2005 and Form 10-K/A for the year ended December 31, 2004. The Form 10-K/A for 2004 will include restated financial statements for each of the years 2002 through 2004 and restated financial results for the years 2000 and 2001 in the Selected Financial Data.

Financial Agreements Update

In connection with the restatements announced on Oct. 10, Dana had notified the trustee under its Indentures dated Aug. 8. 2001 and Mar. 11. 2002. that the company may have violated a covenant in those Indentures with respect to furnishing financial statements prepared in accordance with generally accepted accounting principles. On Nov. 4. the trustee advised Dana that it had notified the registered holders of the notes issued under those Indentures of this possible violation and of Dana's intention to restate its financial statements in the near term. Dana expects to cure the possible violation by filing its financial statements within the 60-day period provided in the Indentures.

The company is currently in discussions with its bank groups regarding an extension of the covenant waivers for its existing principal bank facility and accounts receivable facility from Nov. 30, 2005 to beyond year end. as well as amendments to the bank facility. The company is also discussing with its bank group possible modifications to the existing facilities or the creation of successor facilities.

## DEFENDANTS' VIOLATION OF GAAP RULES
## IN ITS QUARTERLY AND ANNUAL REPORTS FILED WITH THE SEC

64.     By not ensuring that Dana had adequate internal controls in place to detect and remedy accounting improprieties, Defendants failed to prevent the following violations of GAAP.

65.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. §210.4-01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

66.     Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

(a)     The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10):

(b)     The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34):

(c)     The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of

41

transactions, events. and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1. ¶40);

(d)     The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42):

(e)     The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2. ¶79);

(f)     The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2. ¶¶58-59): and

(g)     The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated. (FASB Statement of Concepts No. 2, ¶95).

67.     The adverse information concealed by defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. 229.303).

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

68.     Plaintiff brings this action derivatively in the right and for the benefit of Dana to redress injuries suffered. and to be suffered, by Dana as a direct result of the breaches of fiduciary duty by the Individual Defendants. Dana is named as a nominal Defendant solely in a derivative capacity.

69.     Plaintiff will adequately and fairly represent the interests of Dana in enforcing and prosecuting its rights.

70.     Plaintiff is and was an owner of the stock of Dana during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholders of the Company.

71.     The current board of directors of Dana consists of the following ten individuals: Gabrys, Kelly, Priory, Gibara, Berges, Grise, Burns, Baillie, Marks, and Carpenter. Plaintiff has not made any demand on the present Board of Directors of Dana to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons.

72.     As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the Defendants knew, or was reckless in not knowing, the adverse non public information regarding the state of the Company's internal financial controls and the accounting improprieties related to Dana.

73.     Dana's board maintains a Compensation Committee which sets the compensation levels of senior management and administers Dana 's stock option plans and employee stock purchase plan. The Compensation Committee operates under a charter, under the terms of which it is directly responsible for establishing annual and long-term performance goals and objectives for the Company's elected officers. This responsibility includes: (i) reviewing the Company's executive compensation philosophy and strategy at least annually; (ii) establishing corporate and individual goals and objectives at least annually relating to the compensation of the CEO, Defendant Burns, and other senior executives, such as the CFO, Defendant Richter, under Dana's incentive compensation and equity-based plans; (iii) evaluating the performance of CEO

Burns and other senior executives, such as CFO Richter, at least annually and to determine their compensation, including base salaries, incentive compensation and equity compensation, considering, among other things, in determining long-term incentive compensation for CEO Burns and CFO Richter, Dana's performance and relative shareholder return; (iv) approving or recommending employment or consulting agreements, severance agreements, change in control arrangements, stock ownership guidelines, prerequisites and special, supplemental or non-qualified benefits for CEO Burns and CFO Richter; and (v) to approve or recommend new incentive or equity based compensation plans for CEO Burns and CFO Richter.

74.     The Compensation Committee is comprised of Defendants Priory (Committee Chairman), Baillie, Burges, and Kelly.  As the members of the Compensation Committee singularly control the compensation and incentive awards of Defendant Burns, he will not institute this action against Defendants Priory, Baillie, Burges, and Kelly.  To do so would jeopardize his personal financial compensation.  Thus, demand on Defendant Burns is, and would have been, futile.

75.     The principal professional occupation of Defendant Burns is his employment with Dana, pursuant to which he received and continues to receive substantial monetary compensations and other benefits.  Specifically, Dana paid Defendant Burns at least $11.65 million in 2004, and granted him options to purchase 510,000 shares of Dana stock. Accordingly, Defendant Burns lacks independence from Defendants Priory, Baillie, Burges, and Kelly, Defendants who are not disinterested and/or independent and who exert influence over Defendant Burns's compensation by virtue of their position as members of the Compensation Committee.  This lack of independence, together with his employment with Dana, renders

Defendant Burns incapable of impartially considering a demand to commence and vigorously prosecute this action.

76.     Dana's directors are not disinterested or independent because they are personally liable for the breach of fiduciary duties for failing to implement proper internal controls and reporting systems, resulting in the Company's misrepresenting its financial condition. Thus, the Dana board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action, because its members are interested personally in the outcome as it is their actions that have subjected Dana to millions of dollars in liability for possible violations of applicable securities laws.

77.     Dana's board also maintains an Audit Committee which is responsible for, among other things, reviewing the scope and results of the audit and other services provided by Dana's independent auditors. The Audit Committee's charter sets forth additional responsibilities of the Committee including: (i) appointing the independent auditors and replacing them when necessary; (ii) evaluating the qualifications, independence and performance of the independent auditors; (iii) being directly responsible for oversight of the auditor's work, including resolution of disagreements between the auditors and management; (iv) pre-approving the audit; (v) receiving from the auditors annual written reports, and determining the Company's independence; (vi) reviewing with the auditors and the Company's accounting executives the critical accounting policies and practices used in Dana's quarterly and annual financial reporting; (vii) reviewing the quarterly and annual financial reports before they are filed; (viii) discussing earnings releases and announcements, as well as financial information and earnings guidance provided to analysts and rating agencies, before such information is released; (ix) reviewing the Company's major financial risk exposures; (x) meeting at least quarterly with the auditors,

management and senior accounting executives in separate executive sessions; (xi) preparing the audit committee report required by the rules of the SEC; (xii) to review the performance of the Audit Committee and the adequacy of its Charter annually; and (xiii) reporting its activities to the board regularly.

78.    The audit committee met eight times in 2004.

79.    Five of the ten board members, Defendants Gabry (Committee Chairman), Carpenter, Gibara, Grise, and Marks, serve on the Audit Committee. As such, they breached their fiduciary duties to the Company by failing to ensure Dana had an adequate system of internal controls such that its financial results were accurately reported and by failing to insure against and/or acquiescing in Dana's violations of GAAP. Because Defendants Gabry, Carpenter, Gibara, Grise, and Marks cannot be expected to bring an action against themselves, it is, and would have been, futile to make a demand on the other five Defendants, as no majority would or could be reached in favor of instituting such action.

80.    The acts complained of constitute violations of the fiduciary duties owed by Dana's officers and directors and these acts are incapable of ratification.

81.    Any suit by the current directors of Dana to remedy these wrongs would likely expose the Individual Defendants and Dana to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

82.    Dana has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not

filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Dana any part of the damages it suffered and will suffer thereby.

83.     If Dana's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duties alleged in this Complaint by directors' and officers' liability insurance, then they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of Dana.   However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions that eliminate coverage for any action brought directly by Dana against these Defendants, known as the "insured versus insured exclusion."   As a result, if these directors were to sue themselves or certain of the officers of Dana, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.   On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.   If there is no directors' and officers' liability insurance at all, then the current directors will not cause Dana to sue them, since they would face a large uninsured liability.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duties

84.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

85.     The Individual Defendants owed and owe Dana fiduciary obligations by which they are required to afford Dana the highest obligation of good faith, fair dealing, loyalty and due care.

47

86.    The Individual Defendants, and each of them, violated and breached their fiduciary duties.

87.    Each Individual Defendant knew or was grossly reckless in not knowing that Dana did not have adequate internal accounting controls in place, that the lack of proper controls had resulted in the inaccurate reporting of the Company's financial statements, and that the Company would fail to adequately disclose its lack of internal accounting controls and accounting improprieties.   These Defendants also knew or should have known that the Company's lack of oversight had led to ongoing violations of GAAP.

88.    The Individual Defendants failed to take any good faith steps to remedy these deficiencies or to prevent the illegal and/or improper conduct from occurring.   Thus, these actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

89.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Dana has sustained significant damages.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

90.    Plaintiff, on behalf of Dana, has no adequate remedy at law.

## COUNT II

### Against Defendants Burns and Richter for Disgorgement
### Under the Sarbanes-Oxley Act of 2002

91.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

92.    Pursuant to § 304 of the Sarbanes-Oxley Act, because Dana is required to restate its financial reports for at least 2004 and the first two quarters of 2005, defendants Burns and Richter, as Dana's CEO and CFO during the restatement period, are required to reimburse Dana

48

for all bonuses or other incentive-based or equity-based compensation received by them from Dana during restatement period.

93.     Defendants Burns and Richter are also liable to plaintiff for reasonable costs and attorneys' fees in the prosecution of this derivative action on behalf of Dana.

### COUNT III

### Against All Defendants for Unjust Enrichment

94.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

95.     By their wrongful acts and omissions, Individual Defendants were unjustly enriched at the expense of and to the detriment of Dana.

96.     Plaintiff, as a shareholder and representative of Dana, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

a.     Against each Individual Defendant and in favor of nominal Defendant Dana  for the amount of damages sustained by the Company as a result of the breaches of fiduciary duties alleged herein;

b.     Requiring the Individual Defendants to return to Dana all salaries and the value of other remuneration of whatever kind paid to them by the Company during the time they were in breach of the fiduciary duties they owed to Dana;

c.     Ordering the Individual Defendants, and those under their supervision and control, to implement and enforce policies, practices and procedures on behalf of Dana and its stockholders that are designed to detect and prevent the misconduct described herein;

d.     Awarding plaintiffs the costs and disbursements of this action, together with reasonable attorneys' fees and costs and expenses;

e.     Ordering Dana to implement remedial measures to ensure the practices and acts as complained of herein are not repeated

f.     Such other and further relief as is just and proper in light of all the circumstances of this case.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: December 8, 2005

Daniel R. Karon (OH Bar #69304)
**GOLDMAN SCARLATO & KARON, P.C.**
55 Public Square, Suite 1500
Cleveland, OH 44113
Telephone:   (216) 622-1851
Facsimile:    (216) 622-1852

Christopher J. Keller
**LABATON SUCHAROW & RUDOFF LLP**
100 Park Avenue, 12th Floor
New York, New York 10017
Phone:     (212) 907-0700
Facsimile:   (212) 907-0477

Paul J. Scarlato
Mark S. Goldman
Brian D. Penny
**GOLDMAN SCARLATO & KARON, P.C.**
101 West Elm Street. Suite 360
Conshohocken, PA 19428
Telephone:    (484) 342-0700
Facsimile:    (484) 342-0701

*Attorneys for Plaintiff*

## VERIFICATION

Traute R. Weiderman ("Weiderman") hereby declares under penalty of perjury that she is the derivative shareholder plaintiff in the foregoing Shareholder Derivative Complaint ("Complaint"), and that she has reviewed the Complaint and knows the contents thereof. Weiderman also declares that those allegations made based upon her personal knowledge are true, and that for those matters alleged upon information and belief, she believes them to be true.

Dated: December 5, 2005

Traute R. Weiderman
Traute R. Weiderman